IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 10, 2007 Session

## ANALIZA P. BURNETT v. DAVID MARK BURNETT

**Appeal from the Circuit Court for Shelby County**
**No. CT-006762-03     James F. Russell, Judge**

---

**No. W2007-00038-COA-R3-CV - Filed March 19, 2008**

---

This is a divorce case. When the parties met in 1995, the husband was in the Philippines working for an American corporation. The wife was a resident and citizen of the Philippines and the husband was a U. S. citizen. After a brief relationship, the wife learned that she was pregnant. The husband moved back to the United States, but made periodic trips to the Philippines to see their child. In 1998, the wife obtained a marriage visa, and she and the child moved to California to live with the husband. After signing a prenuptial agreement in California, the parties were married in Las Vegas. Two more children were born of the marriage. In 2003, both parties filed for divorce. After a trial, the parties were divorced and the husband was ordered to pay child support, alimony in futuro, and all of the parties' marital debt. The husband was also ordered to pay for the wife's medical insurance and uninsured medical expenses as additional spousal support. The wife was designated as the children's primary residential parent. The parties were ordered to hold the marital home as tenants in common; the husband would pay the mortgage and the wife would live in the home with the parties' children. The husband appeals. On appeal, we affirm the trial court's adoption of the Wife's parenting plan except insofar as it awards the federal income tax exemptions to the wife, but vacate the child support award and remand for a recalculation of the husband's income and his child support obligation. We also vacate the trial court's order regarding spousal support and remand for recalculation of the husband's income and re-evaluation of the wife's need and the husband's ability to pay support. We affirm as to the remainder of the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part;**
**Vacated in Part; and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Mitchell D. Moskovitz and Adam N. Cohen, Memphis, Tennessee, for the appellant, David Mark Burnett

Dennis J. Sossaman, Memphis, Tennessee, for the appellee, Analiza P. Burnett

## OPINION

### FACTS AND PROCEEDINGS BELOW

Since 1990, Defendant/Appellant David Mark Burnett ("Husband") has been employed by FedEx as one of their 300 global account managers, a sales position. In 1994, FedEx transferred him to the Philippines. In the Philippines, Husband met Plaintiff/Appellee Analiza Palatones ("Wife"). At the time, Wife was a resident and citizen of the Philippines. In the latter part of 1995, they had a brief relationship. Soon after their relationship ended, Wife informed Husband that she was pregnant. Their daughter, Crystal Burnett, was born on October 22, 1996, in the Philippines.

Six months later, in 1997, Husband was transferred from the Philippines to Burbank, California. After Husband returned to the United States, Husband and Wife stayed in contact. Wife was not employed, so Husband rented a home for Wife and their daughter, and sent them money regularly. He visited the Philippines several times to see Crystal.

Husband wanted Crystal to grow up in the United States. Husband believed that, in order for Crystal to do so, Wife would have to obtain a marriage visa, and he and Wife would have to marry. Thus, in 1998, Wife applied for and obtained a marriage visa.

In August 1998, Wife and Crystal moved from the Philippines to Husband's home in Burbank, California. In order to protect his current and future assets, Husband told Wife that, before he would marry her, she had to sign a prenuptial agreement. He told her that he would not marry her without such an agreement. Husband secured the services of a California attorney, who represented Husband and drew up a proposed agreement. Wife was also furnished with a California attorney. A provision in the agreement indicates that Wife's attorney advised her against signing the proposed prenuptial agreement, but Wife executed it against this advice.

In general, the prenuptial agreement stated that both parties waived a number of potential rights resulting from marriage to one another and described properties that would remain the separate property of each spouse. It also addressed spousal support in the event that either party filed for divorce.[1] The agreement provided that it would be governed by California law, and that if litigation

---

[1] In part, the prenuptial agreement provides:

3.02  ANNALIZA [sic] covenants and agrees that all property now owned by DAVID of whatsoever nature and wheresoever located and any property which he may hereafter acquire, whether real, personal, or mixed, including but not limited to any earnings, salaries, commissions, or income resulting from his personal services, skills, and efforts as well as interest, earnings and accumulations thereon, prior to marriage shall be and remain his sole and separate property to use and dispose of as he sees fit and as if no marriage had been entered into.

3.04  It is the intention of the parties to live in DAVID's house, commonly known as 1059 East

(continued...)

-2-

arose out of the agreement, the prevailing party would be entitled to his or her attorney's fees.  In

[1] (...continued)

Walnut Avenue, Burbank, California 91501.  By this Agreement, ANNALIZA [sic] expressly waives any and all interest in and to said house, said waiver to include, without limitation, any claim for reimbursement based upon payments made by either party before or during the marriage, including without limitation mortgage, maintenance, improvements, taxes, and insurance, whether said payments are made from the separate property or community property of either party.  In addition, ANNALIZA [sic] expressly waives and gives up any equitable or other claim to the appreciated value in and to said house and any reduction of principal during the time the parties live in the house, or at any time during the marriage, which rights are commonly known as Moore/Marsden rights.

3.05    DAVID and ANNALIZA [sic] agree that in the event either party files for dissolution of marriage, the first two years of their marriage shall be excluded [from] any consideration in the awarding of spousal support, as though it did not exist.  To the extent applicable, the parties waive the provisions of Family Code § 4320(f) and § 4320(k) which provides that a court of competent jurisdiction, in determining spousal support, shall take into account the duration of the marriage, and that a "reasonable period of time" for a party to become self-supporting shall generally be one-half the length of the marriage.  The parties understand that as a consequence of this provision, should either party file for dissolution of marriage within two years of their marriage, neither party shall be entitled to apply for or receive spousal support from the other.  For example, if the parties are married for six years, the Court shall, in determining both amount and duration of spousal support, deem the marriage to be of 4 years' duration.

* * *

3.09    The parties agree that all rents, issues, profits, increase, appreciation, and income from the separate property of DAVID, as set forth in Exhibit "A" shall remain his separate property.  The parties agree that a change in the form of DAVID's separate property shall not constitute a change of characterization, and the separate property shall remain DAVID's separate property regardless of any change in form.  For example, if DAVID sold his consideration, and deposited the proceeds from the sale in a bank account, that bank account would remain DAVID's separate property; if DAVID used the payments that he received on said consideration to invest in a business, that business, together with all of its assets, tangible and intangible, would remain DAVID's separate property; if DAVID traded some of his real estate for other real estate, that new real estate would remain DAVID's separate property.

* * *

3.12    The occurrence or commingling or otherwise failing to segregate the separate property or separate income of either party shall not change or constitute a change of character of that property, nor shall it constitute a transmutation of that separate property or income into community, quasi-community, joint marital, or similar type of property.

* * *

3.15    Nothing shall prevent the parties from jointly acquiring property or obligations.  However, such community property or community obligations shall be clearly set forth as such, and shall contain, at a minimum, the names of both parties.

* * *

3.23    DAVID and ANNALIZA [sic] expressly acknowledge and agree, in conformity with California Family Code Section 1615, that this AGREEMENT is being executed by the parties voluntarily, that neither party waived in writing the right to disclosure of the property or financial status and obligations of the other party, and that the parties had adequate knowledge of the property and financial obligations of the other party.

exhibits to the agreement, both parties listed their assets. Husband listed a condominium in Burbank valued at $25,000, his home in Burbank valued at $50,000, and unnamed stocks valued at $60,000. He listed pension, profit sharing, and 401(k) plans, as well as bank accounts, but these were all listed as "value unknown." His compensation with FedEx was not listed. The exhibit listing Wife's assets said only, "Miscellaneous jewelry and personal property, value approximately $5,000.00."

Two days after the parties signed the prenuptial agreement, they went to Las Vegas, Nevada, for a brief wedding ceremony in the "Tunnel of Love." Husband, Wife, and Crystal lived together as a family in Husband's home in Burbank. In 1999, the parties' second child, Hanna, was born.

In 2000, Husband's employer, FedEx, transferred him to Memphis, Tennessee. The parties' residence in Burbank was sold, and the family moved to 1196 Heather Ridge Cove in Collierville, Tennessee ("Heather Ridge residence"). The Heather Ridge home was titled in both parties' names as tenants by the entirety. Later in 2000, the parties' third child, Jade, was born. Throughout this time, Wife was not employed outside the home.

The parties' relationship deteriorated. Finally, on December 4, 2003, Wife filed for divorce on the grounds of irreconcilable differences and inappropriate marital conduct.[2] Husband answered and counterclaimed for absolute divorce on the same grounds. The parties then engaged in discovery, and a trial date was set. During the pendency of this case, Husband resided in a home owned by his father and located on Fletcher Road in Collierville ("Fletcher Road residence").

---

[2]There was little evidence regarding any specific events or circumstances that may have triggered the parties' decision to seek a divorce.

Prior to trial, Wife filed a Rule 14C affidavit[3] listing $4,602 in monthly expenses. The expenses included the mortgage payment for the Heather Ridge residence, utilities and home maintenance expenses, prescription medication, and food and clothing. Some of the expenses listed related to the children, such as school lunches and day care. Wife described her occupation as "homemaker," and listed no income. The debts listed included $2,500 in credit card debt, a $4,000 loan for Wife to attend cosmetology school, and approximately $4,200 in debts that Husband incurred during the marriage. In her Rule 14D memorandum,[4] submitted prior to trial, Wife sought

---

[3]Rule Fourteen (C) states:

**C. Sworn Statement Pertaining to Child Custody, Child Support or Alimony.**

(1) In all contested divorces or suits for separate maintenance, where no marital dissolution agreement or property settlement is mutually agreed upon, each party shall file with the clerk within 90 days after an answer is filed, or 120 days after suit is filed (whichever is sooner), a sworn statement setting forth his or her income, a list of expenses, and a description and valuation of real or personal property possessed in any form, the state of its title, and his or her claimed interest in such property. Said sworn statement shall also include, if known, or if the information is reasonably procurable, the income and property interest of the opposing party, both real and personal, and the valuation thereof. Any changes in said statement shall be made as soon as possible, and not later than ten (10) days before the trial, unless circumstances beyond a party's control are shown.

(2) The statement shall set forth separately the amount deducted from salary for social security and income tax. Self-employed persons shall estimate these sums, using governmental guidelines and such other reliable sources as are available.

* * *

(3) In all custody proceedings the sworn statements required by T.C.A. § 36-2-210 must also be contained in the pleadings or in an affidavit attached to the pleading.

Rule Fourteen (C) of the Circuit Court for the Thirtieth Judicial District (Shelby County).

[4]Rule Fourteen (D) states:

**D. Contested Divorces.** Before trial of any contested divorce begins, counsel shall hand to the court a memorandum including the following:

(1) Certification that the party's Rule Fourteen (C) affidavit of income and expenses is in the file.

(2) Whether the client wishes a divorce, legal separation, to remain married, or to allow the other spouse to obtain one of the foregoing.

(3) Whether grounds can be stipulated to avoid proof. T.C.A. § 36-4-129.

(4) The names and ages of any children of the parties.

(5) The names of the children whose custody is sought.

(6) The nature of the visitation sought: (e.g. "reasonable" or specific). If specific, the details thereof.

(7) The amount of child support sought.

(8) Proposed disposition of the home.

(9) Fair market value of home and amount of mortgage.

(10) Proposed disposition of any other real property and their values.

(11) Proposed division of debts.

(continued...)

$2,500 per month in rehabilitative alimony for forty-two months, and alimony in futuro in the form of medical and prescription drug coverage. She submitted that she should receive the marital residence, the vehicle she was driving, and half of one of Husband's retirement accounts and a fourth of another. Wife's memorandum asserted that Husband should be allocated all of the debts in his name, the debt for Wife's cosmetology school training, and Wife's credit card debts incurred during the marriage. Wife's 14D memorandum did not refer to the prenuptial agreement executed by the parties.

Husband also filed a Rule 14C affidavit prior to trial, listing monthly expenses of $7,220, including, among other things, mortgage payments on the Heather Ridge residence, payments on a home equity line of credit, taxes, home maintenance on both the Heather Ridge residence and the Fletcher Road residence, various insurance expenses, taxes, utilities, proposed child support payments of $959 per month, and attorney's fees. Apart from expenses for the children or for the Heather Ridge home, Husband's personal living expenses consisted of household supplies, home telephone, cable television, food and groceries, dining out, clothing, dry cleaning, entertainment, automobile insurance, work lunches, haircuts, internet, prescription medicines, and doctor bills. He listed a monthly net salary of $4,829, not including bonuses. His affidavit stated that his bonuses for 2003, 2004, 2005, and 2006 were $7,389, $20,810, $36,810, and $43,402, respectively. As his separate property, Husband listed the Heather Ridge residence and two FedEx retirement accounts with a total value of approximately $260,000.

In the initial Rule 14D memorandum filed by Husband, he argued that he should pay Wife rehabilitative alimony of $400 per month for three years, plus transitional alimony in the form of mortgage payments on the Heather Ridge residence for five years. He claimed that the only marital debt was a Home Depot account, and he agreed to be responsible for it. Apart from this debt, he contended that each party should be responsible for any debt in his or her name. Relying on the prenuptial agreement, Husband's 14D memorandum asserted that virtually all of the real property, retirement accounts and other property, with the exception of personal items and home furnishings, were his separate property.

In preparation for the trial, the trial court held a hearing to determine whether Wife needed an interpreter. The trial court recognized that Wife's command of English was deficient, but ultimately did not order that Wife be furnished an interpreter. Thereafter, a five-day bench trial was held, beginning on January 10, 2006. The parties stipulated the existence of grounds for divorce,

---

[4](...continued)
        (12) Specific items of personalty sought, and their values.
        (13) The amount and type of alimony sought (in solido, etc.).
        (14) The amount of attorney's fee sought.
        (15) Certification that the above written proposals were submitted to opposing counsel at least 24 hours before the trial.

Rule Fourteen (D) of the Circuit Court for the Thirtieth Judicial District (Shelby County).

and evidence was presented on other issues, including interpretation of the prenuptial agreement, spousal support, child support, the permanent parenting plan, distribution of marital debt and property, and attorney's fees. The only witnesses were Husband and Wife.

Due to scheduling conflicts, the first two days of trial and the conclusion of the trial were separated by several months. During this interim, the child support guidelines changed, resulting in a higher child support obligation for Husband. As a result, after the first two days of trial, Husband submitted an amended Rule 14D memorandum in which he asserted that, due to his increased child support obligation, he should not be required to pay Wife any rehabilitative alimony.

Wife testified at the outset of the trial; her testimony reflected a limited understanding of the English language. Thirty-six years old at the time of trial, Wife described her education and work history. She said that, while growing up in the Philippines, she obtained the equivalent of a high school education. In the Philippines, she worked at times as a seamstress. Her first job in the United States was as a salesperson at a Dillard's department store; before long, she was fired from that position. Wife attended cosmetology school, but developed allergies to the substances used[5] and did not obtain the licensing necessary to seek employment as a cosmetologist. At the time of trial, Wife had a part-time job as a waitress earning $3.50 per hour plus tips, and another part-time job for Northwest Airlines earning $6.35 per hour, escorting unaccompanied minors to and from their flights. In these jobs, over a two-week period, Wife earned approximately $200. Wife's part-time position with Northwest Airlines was seasonal.

Wife also testified about her knowledge of the parties' assets. At the time of the trial, Wife was residing in the Heather Ridge marital home with the parties' children. For approximately two years, Husband had been living in the Fletcher Road residence. The parties owned two vehicles; Wife drove the parties' Toyota minivan. She did not know whether the parties had fully discharged the debt they incurred to purchase that vehicle. Wife testified that she had a bank account, but had only six dollars in it. Wife had very little knowledge of any other assets owned by the parties or by Husband individually.

Wife also testified about the parties' debts and her personal expenses. She corroborated the debts set forth in her Rule 14C affidavit, including the $4,000 balance on the loan for her cosmetology classes, approximately $4,200 in debts that Husband had incurred during the marriage, and $2,500 in credit card debt that she incurred during the marriage. Wife asserted that she was not paying on any of these debts because she had no money. Wife also corroborated the $4,602 in monthly expenses listed in her Rule 14C affidavit, which included the mortgage on the Heather Ridge residence.

Wife's proposed parenting plan was introduced into evidence as a trial exhibit. Wife's plan proposed that she be designated as the primary residential parent and spend 285 days per year with

---

[5]Apparently wife's cosmetology training was in performing manicures and pedicures, and she developed an allergy to the chemicals used.

the children, while Husband would be allocated 80 days with them. She proposed that Father spend every other weekend with them, picking them up from school every other Friday at 5:00 p.m., and keeping them until Sunday at 6:00 p.m. In her testimony, Wife explained that the reason for this proposal was that Husband had a very busy travel schedule for his job. She testified that his job required a great deal of travel, and that it interfered with his parenting time, at times leaving him unable to pick up the children when he was scheduled to do so. Under Wife's plan, the parties would have joint decision-making authority, but Wife would be the "tie-breaker"; in the event of a disagreement, she would have the final authority.[6]

Wife testified that she had never understood the parties' prenuptial agreement. She took the position that the parties' property should be allocated without regard to the agreement, as reflected in her Rule 14D memorandum. She reiterated the positions set forth in her Rule 14D memorandum: Husband should be responsible for all debts in either party's name, she should receive the Heather Ridge residence, half of one of Husband's retirement accounts and approximately one-fourth of the other, title to the vehicle that she was driving, spousal support in the amount of $2,500 per month for forty-two months, and alimony in futuro in the form of medical prescription coverage. Wife testified that the medical prescription coverage was necessary because Husband had infected her with the herpes virus, the treatment for which was very expensive. She said that, after the parties separated, she opened credit card accounts in her name and used them to purchase clothing for the children and to take them on a vacation to Virginia.

In her testimony, Wife acknowledged that, during the parties' separation, the children had been spending more than two nights per week with Husband. She said that shortly before the trial, her schedule for her part-time job with Northwest Airlines changed such that she had to leave her house at 5:00 a.m. in order to be at work at 6:30 a.m. This schedule change necessitated having the children spend the night at Husband's home. She said that Northwest Airlines changed the schedules every two months, and that she did not know whether she would be on the next schedule or whether she would be laid off. When asked whether she was prepared to quit her job in order to take care of the children as the primary residential parent, Wife stated, "I can quit anytime [to take care of] my children. I would love to do that."

Husband testified next. Forty-five years old at the time of trial, Husband testified that he had been employed with FedEx for sixteen years, and that at the time of trial, he was one of 300 FedEx global account managers, which is primarily a sales job. He said that he received a net base salary of $4,829 per month plus quarterly bonuses, and that the amount of the bonuses could change significantly from one year to the next. In 2005, Husband earned salary plus bonuses totaling $120,213.38. For 2006, Husband's FedEx earnings statement through October 14, 2006 showed gross earnings of $111,812.80, consisting of base salary plus bonuses. As noted above, Husband's

---

[6]At one point during cross-examination, Wife was asked whether she objected to Husband having the final authority over education decisions, and Wife said that she did not. On re-direct, Wife said that she did not recall making such a statement. The record does not indicate whether Wife's contradictory testimony was a result of her lack of proficiency in English.

Rule 14C affidavit showed his bonuses for 2003, 2004, 2005, and 2006 were $7,389, $20,810, $36,810, and $43,402, respectively.

In his testimony regarding Wife's earning capacity, Husband asserted that Wife had marketable job skills and could earn approximately $16,000 per year. He noted that she had worked as a seamstress in the Philippines and that she attended cosmetology school in the United States. He dismissed Wife's allergies, saying that he had never known them to prevent her from doing anything. Husband acknowledged that Wife had never earned $16,000 in any given year, but reasoned that this should be considered her earning capacity because "[i]f you amortize what [Wife] can make in a month," it added up to $16,000 per year.

Husband maintained that the prenuptial agreement, specifically paragraph 3.08, should govern the issue of spousal support. Husband alleged that paragraph 3.08 constituted a waiver of spousal support. In light of his proposal for transitional alimony in the form of mortgage payments on the Heather Ridge residence and his substantial child support payments, Husband took the position that he should not also be expected to pay Wife any additional support.

Husband took the position at trial that the prenuptial agreement should also govern the trial court's division of the parties' assets. This would result in virtually all of the real property and financial assets being awarded to him as his separate property, with the exception of the parties' personal property and home furnishings. He asserted that, under paragraphs 3.02, 3.04 and 3.09 of the prenuptial agreement, the Heather Ridge residence, valued at $230,000 to $240,000, should be considered his separate property because it was purchased with the proceeds from the sale of his separately-owned Burbank residence. He maintained that this should be the result despite the house being jointly titled. Husband said, however, that he was willing to let Wife live in the house for a period of five years after the divorce, while he paid the mortgage payments as transitional alimony.

As to the parties' marital debts, Husband testified that Wife should be responsible for credit card accounts opened without his knowledge. He testified that he neither opened these accounts nor charged on them. Husband acknowledged that he should be responsible for other debts that he had incurred during the marriage. Husband submitted that the "only known marital debt" was a Home Depot charge account, for which he agreed to be responsible. He proposed that the parties be held individually responsible for any further debt incurred in their respective names, including any attorney's fees arising out of the divorce proceedings.

Husband next testified about parenting issues. During the parties' separation, Husband said, he had exercised parenting time every weekend from Friday until Sunday night, as well as some nights during the week. He conceded that his work required significant travel, but asserted that he had "complete control" over his travel schedule, and that it would not interfere with his parenting time. Husband's parenting plan proposed that Wife be designated as the primary residential parent, but that he be allocated 176 days per year of parenting time, and Wife be allocated 189 days. Husband proposed a day-to-day schedule in which he would have responsibility for the children from Friday after school until Wednesday after school every other week, as well as Monday nights on the

alternating weeks. Husband's parenting plan proposed that the parties have joint decision-making authority over non-emergency healthcare, religious upbringing, and extracurricular activities, and that he be given sole decision-making authority over educational issues.

Husband asserted that Wife's new work schedule at Northwest Airlines, requiring her to leave the house at 5:00 a.m. to be at work at 6:30 a.m., would prevent her from exercising the parenting time proposed in her parenting plan. He stated that he could be available to take care of the children on the mornings when Wife had to be at work at 6:30 a.m., but that it was "not practical" because the amount of time required in the mornings to take care of the children could interfere with his ability to perform at work. He added, "I love my kids, and I'll be flexible, and I'll do anything I possibly can, but I have to maintain my ability to produce on my job."

Husband acknowledged that he had transmitted the herpes virus to Wife.

On November 13, 2006, approximately two weeks after the close of the proof, the trial court delivered its oral ruling.

The trial court found that the parties had executed the prenuptial agreement, but expressed skepticism about the voluntariness of Wife's agreement. The trial court noted that Wife had not read the document, that Husband had told Wife that if she did not sign it he would not marry her and she would have to return to the Philippines, that there had been no negotiation, and that Wife had signed the agreement against the advice of her attorney. The trial court plainly felt that Husband's disclosures about his assets and income had been inadequate, pointedly observing that his FedEx income was not listed.[7] It acknowledged, however, that Wife did not challenge the validity of the agreement, only Husband's interpretation of the agreement. The trial court concluded that title to the Heather Ridge residence was governed by paragraph 3.15 of the prenuptial agreement, which stated that the agreement did not prevent the parties from jointly acquiring property, and not by paragraphs 3.02 or 3.04 of the agreement. Accordingly, the trial court found that the marital residence was not Husband's sole separate property; rather, the trial court stated that it would "not disturb the interest in the real estate on Heather Ridge," and ordered that the parties take title to the marital residence as tenants in common. The trial court commented that Wife could remain in the residence "for as long as she desires," and indicated that it was aware of the problems that could arise were either party to sell his or her interest in the property. The trial court found that the other assets claimed by Husband, including his FedEx retirement accounts, were, by operation of the prenuptial agreement, his separate property.[8]

_____

[7]The trial court commented that the prenuptial agreement's recitation that its terms were not "one-sided" was a "myth."

[8]The trial court observed that there was no explanation in the record about the disposition of Husband's condominium in Burbank, and wondered aloud if it was linked to Husband's residence at the time of trial, the Fletcher Road residence, a house purportedly owned by Husband's father. No express finding was made on this issue.

-10-

The trial court next discussed the parties' marital debt. It observed that Wife's income and earning history were "meager at best," and found that, regardless of whether she continued her minimum wage employment, she simply did not have the means to satisfy any of the debts created during the marriage. Accordingly, the trial court ordered Husband to pay, "as and when due, until fully satisfied, all of the indebtedness of the parties" as it existed as of the date of entry of the final divorce decree.

Next, the trial court addressed the issue of spousal support. The trial court discussed at length a California law review article dealing with the validity, under California law, of spousal support waivers in prenuptial agreements, and appeared to conclude that the spousal support waiver in the parties' prenuptial agreement was unenforceable. In light of this holding, the trial court issued its ruling regarding spousal support. The trial court found that Wife had no marketable job skills, and was further limited by language difficulties, educational background, and the responsibilities of taking care of the parties' children. In the face of these obstacles, the trial court concluded that the goal of rehabilitation was "simply not realistic." It commented that, without "meaningful spousal support" and an upward deviation in child support, Wife and the parties' children "would be destitute and candidates for the welfare rolls."

Evaluating Husband's ability to pay spousal support, the trial court noted that Husband had earned $120,213 in 2005, minus $32,160 in deductions. It also found that, by the time of trial in 2006, Husband had already earned $111,812, with year-to-date deductions of $28,200. From this, the court found that Husband had received "for 10.5 months of [2006] an average of 10,649 dollars per month." The court then stated, "There are 2.5 months remaining in [2006]. By year's end, . . . [Husband] should earn an additional 26,222 dollars, making a total projected annual income for year 2006 of 137,112 dollars." Thus, it based its finding regarding Husband's income on his earnings from January through mid-October, 2006.

To evaluate Wife's needs, the trial court focused on her Rule 14C affidavit. Excluding the mortgage payments on the Heather Ridge home and other expenses not otherwise specifically paid by Husband, the trial court found her total monthly expenses for "basic needs" to be $1,255. Accordingly, the trial court ordered Husband to pay Wife $1,255 per month as alimony in futuro. Citing Wife's need of medications for the herpes virus, the trial court ordered Husband to pay additional alimony in futuro in the form of "full health care benefits" and "one-half of any reasonable and necessary health care costs not covered by such insurance."

The trial court next turned to the parenting plan. It noted that Wife had historically been the children's primary caregiver, and that Husband traveled extensively for his job with FedEx. The trial judge stated that he was "simply not . . . persuaded" by Husband's testimony that he had gained more control over his travel schedule. The court also "accepted as fact" Wife's testimony that she

would quit her job at Northwest Airlines in order to take care of the parties' children.[9] Finding Wife's proposed parenting plan "to be fair and reasonable in every aspect," the trial court adopted it. The trial court then asked the parties to prepare proposed child support orders, using a monthly income of $10,649 for Husband and $0 for Wife. The trial court ordered Husband to pay child support in accordance with the child support guidelines. The trial court stated that Husband's payment of the mortgage on the Heather Ridge residence would be considered an upward deviation in child support, but Husband would be required to continue these payments after the youngest child reached age eighteen.

Finally, the trial court addressed the parties' litigation expenses. The trial court noted that the prenuptial agreement provided for the prevailing party in any subsequent divorce to receive his or her reasonable attorney's fees.[10] It found that Husband had incurred over $44,000 in litigation expenses and Wife had incurred over $15,000.[11] The trial court ordered Husband to pay all of Wife's attorney's fees and expenses, as well as the court costs.

In its subsequent written order, the trial court adopted Wife's parenting plan and residential parenting schedule. It set Husband's child support obligation at $1,769.00 per month. Tax exemptions for all three children were awarded to Wife. The written order on the parties' parenting obligations did not refer to Husband's payment of the Heather Ridge home mortgage as an upward deviation in child support.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

Husband now appeals the trial court's order. On appeal, Husband argues that the trial court erred in awarding Wife alimony in futuro, in adopting Wife's proposed parenting plan, in calculating Husband's child support obligation, and in allocating the tax exemption for the parties' children. Husband contends that the parties should not have been deemed tenants in common as to the Heather Ridge residence, maintaining that it should have been found to be his separate property. Finally, Husband asserts that he should not have been required to pay Wife's attorney's fees and litigation expenses.

Wife argues that the trial court's ruling should be affirmed except insofar as it found that Husband's FedEx retirement accounts were his separate property. Wife also seeks attorney's fees for this appeal.

---

[9]The trial court observed that the hours of Wife's employment with Northwest Airlines were in "such conflict" with her care for the parties' children that continued employment in that capacity would be a "practical impossibility."

[10]The trial court wryly commented that the idea of a prevailing party in domestic litigation is "the proverbial oxymoron."

[11]In the list of the parties' assets attached to the prenuptial agreement, the only asset listed for Wife was jewelry purportedly valued at $5,000. This was apparently sold to pay the $1500 retainer for Wife's attorney.

We review the trial court's findings of fact *de novo* on the record with the presumption that those findings are correct, unless "the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993). We review conclusions of law *de novo* with no presumption of correctness. ***Campbell v. Fla. Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996).

Guidelines for the determination of spousal support are set forth at Tennessee Code Annotated § 36-5-121. The trial court is afforded wide discretion concerning the award of spousal support, and an appellate court should reverse the trial court's findings only if this discretion has "manifestly been abused." ***Hanover v. Hanover***, 775 S.W.2d 612, 617 (Tenn. Ct. App. 1989); ***see also Ford v. Ford***, 952 S.W.2d 824, 827 (Tenn. Ct. App. 1996); ***BIF, a Div. Of Gen. Signals Controls, Inc. v. Serv. Constr. Co., Inc.***, No. 87-136-II, 1988 WL 72409, *3 (Tenn. Ct. App. July 13, 1988).

Determinations of child custody are to be made in accordance with Tennessee Code Annotated § 36-6-106. In making this determination, the trial court should take the child's best interests as its primary concern. T.C.A. § 36-6-106(a) (2005); ***see also Lentz v. Lentz***, 717 S.W.2d 876, 877 (Tenn. 1986). The court should also look to the factors listed in the statute, such as the emotional ties between child and parents, the "stability of the family unit of the parents," the parents' mental and physical health, and the child's "home, school and community record." T.C.A. § 36-6-106(a)(1)-(10) (2005). The lower court's findings as they relate to these factors will be presumed correct unless the preponderance of the evidence is otherwise. Tenn. R. App. 13(d); ***Hass v. Knighton***, 676 S.W.2d 554, 555 (Tenn. 1984).

Trial courts must apply, "as a rebuttable presumption," the Tennessee Child Support Guidelines promulgated by the Tennessee Department of Human Services. T.C.A. § 36-5-101(e)(2) (2005). The trial court has the discretion to deviate from the Guidelines if their application "would be unjust or inappropriate" in a particular case. T.C.A. § 36-5-101(e)(1)(A); ***see also State ex rel. Vaughn v. Kaatrude***, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000). Therefore, we review the trial court's decision with regard to child support for an abuse of discretion. ***Vaughn***, 21 S.W.3d at 248; ***see also BIF***, 1988 WL 72409, at *3.

Tennessee courts must enforce prenuptial agreements in accordance with Tennessee Code Annotated § 36-3-501. Furthermore, prenuptial agreements should be interpreted in the same manner as other contracts. ***See Gilley v. Gilley***, 778 S.W.2d 862, 863 (Tenn. Ct. App. 1989). As the interpretation of prenuptial agreements, like contracts, is a question of law, we review the trial court's interpretation of the agreement at issue *de novo* on the record with no presumption of correctness. ***See Union Planters Nat'l Bank v. Am. Home Assurance Co.***, 865 S.W.2d 907, 912 (Tenn. Ct. App. 1993).

## ANALYSIS

### Parenting Plan and Child Support

We address first the trial court's adoption of Wife's proposed parenting plan. Both parties' plans called for Wife to be designated as the children's primary residential parent. Husband's primary argument is with regard to the allocation of residential parenting time.

Wife's proposed permanent parenting plan provided for Husband to have eighty days of residential parenting time with the children per year, while Husband's plan provided for Husband to have 176 days. After hearing the parties' testimony, the trial court found Wife's plan to be "fair and reasonable in every aspect." We consider Husband's argument that the trial court's findings on this issue were "unquestionably contrary" to the evidence in the record.

The parties' testimony was in accord that Husband's travel schedule associated with his job had, in the past, been very demanding. Wife testified that Husband's travel schedule had significantly interfered with his scheduled parenting time. Husband responded by asserting that, by the time of trial, he had "complete" control over his travel schedule. Husband also testified, and Wife conceded, that, for at least a portion of the parties' separation, he had exercised roughly the amount of parenting time that he had requested in his proposed parenting plan. In rendering his ruling from the bench, the trial judge stated that he was "simply not . . . persuaded" by Husband's testimony that he had more control over his travel schedule than he had in the past. The trial judge stated further that he "accepted as fact" Wife's testimony that she would quit her job at Northwest Airlines in order to take care of the parties' children. Both of these rulings are credibility determinations by the trial court, to which we accord great deference on appeal. **Whitaker v. Whitaker**, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997).

Moreover, the determination of parenting time is a decision that is within the broad discretion of the trial judge. **Eldridge v. Eldridge**, 42 S.W.3d 82, 85 (Tenn. 2001) (citing **Suttles v. Suttles**, 748 S.W.2d 427, 429 (Tenn. 1988)). We will not overturn the trial court's decision absent a finding that the trial court abused its discretion. **Id.** Giving appropriate deference to the trial court's determinations of the parties' credibility, we find no error in the trial court's allocation of residential parenting time.[12]

Husband also argues that the trial court should have granted him final decision-making authority with regard to the children's education, as set forth in his proposed parenting plan. He relies on Wife's testimony on cross-examination that she had no objection to Husband having final authority over education issues. On re-direct, Wife testified that she did not recall giving this testimony. Husband maintains that he should have decision-making authority, especially with respect to education issues, because he has more formal education than Wife. The trial court's

---

[12]The parties' testimony indicated that Wife and Husband worked cooperatively to afford Husband additional residential parenting time when his travel schedule permitted.

-14-

decision on how to weigh Wife's contradictory testimony on this issue is well within the discretion of the trial court, particularly in light of Wife's deficiency in English. Moreover, while the parties' respective educational levels is a factor, it is not the only factor. The trial court was also entitled to consider which parent would be spending the most time with the children, as well as intangibles such as the parties' temperament and judgment. We see no error in the trial court's order on decision-making authority.

Husband also challenges the parenting plan order in that it allows Wife to claim all three of the children as dependents for the purpose of her income tax exemptions. He argues that this award of the tax exemptions to Wife is untenable in light of the trial court's finding that Wife has no actual or imputed income.

The Internal Revenue Code automatically assigns tax exemptions for dependent children to the primary residential parent. I.R.C. § 152(e) (West 2005). Accordingly, the Child Support Guidelines for Tennessee assume, but do not require, that the primary residential parent will claim the exemption for the parties' children. TENN. COMP. R. & REGS. 1240-2-4-.03(6)(b)(2)(ii) (2006); *see also Eaves v. Eaves*, No. E2006-02185-COA-R3-CV, 2007 WL 4224715, *8 (Tenn. Ct. App. Nov. 30, 2007). Such a parent can execute a release of the exemption, which allows the alternate residential parent to claim the exemption. I.R.C. § 152(e)(2). Furthermore, the trial court is permitted to order the primary residential parent to execute such a release. *Barabas v. Rogers*, 868 S.W.2d 283, 289 (Tenn. Ct. App. 1993) (citing *Hooper v. Hooper*, C.A. No. 1130, 1988 WL 10082 (Tenn. Ct. App. Feb. 9, 1988)). At trial, Husband argued that he should be awarded the tax exemptions for the parties' children, and Wife's counsel conceded that Husband was "the person more in need of [the tax exemptions]." Nevertheless, in its written order, the trial court awarded the tax exemptions to Wife. The trial court did not state its reasons for doing so.

We review a trial court's allocation of federal income tax exemptions for minor children for an abuse of discretion. *Chandler v. Chandler*, No. W2006-00493-COA-R3-CV, 2007 WL 1840818, *9 (Tenn. Ct. App. June 28, 2007). The decision to award the exemption "should rest on facts of the particular case." *Id.* at *9.

In *Travis v. Travis*, the wife in a divorce case was awarded custody of the children, but the husband was awarded the tax exemption. *Travis v. Travis*, No. E2000-01043-COA-R3-CV, 2001 WL 261543, *1-4 (Tenn. Ct. App. Mar. 16, 2001). The wife argued on appeal that the trial court erred in awarding the exemption to the husband because "[the husband] did not request . . . the award . . . and because the [trial court] did not consider the financial and tax equities of the parties and gave no reason in its Memorandum Opinion for granting the exemptions to the husband." *Id.* at *4. We affirmed the trial court's award on two bases: the disparity in income between the parties and the requirement that the husband would be responsible for substantial child support under the decree of divorce. *Id.* at *5. After noting that the husband earned a gross income of $2,800 per month while the wife earned gross income of only $4,000 over a period of eight months, we stated, "Consequently, the dependency exemptions will be of great benefit to [the husband] and of relatively little benefit to [the wife]." *Id.* Regarding the husband's responsibility for child support payments,

we further stated, "In consideration of the fact that [the husband] will be responsible for a substantial portion of his children's expenses, it seems to us that he should be allowed the dependency exemptions as a matter of equity." *Id.*

In the case at bar, as in ***Travis***, Husband makes substantial income and Wife has little or no income except the spousal support she receives from Husband. At trial, counsel for Wife conceded that the exemptions should be awarded to Husband. Under these circumstances, despite the fact that Wife is the primary residential parent, we must conclude that the trial court abused its discretion in awarding the federal tax exemptions to Wife. The trial court's ruling on this issue is reversed.

As part of the permanent parenting plan, the trial court ordered Husband to pay child support in the amount of $1,769 per month. This was based on monthly income of $10,600 for Husband and $0 for Wife. The trial court calculated Husband's gross monthly income based solely on extrapolation from the 2006 income he had earned as of the date of the trial.

The determination of child support payments is governed by the Child Support Guidelines ("Guidelines") as established by the Tennessee Department of Human Services. *See* TENN. COMP. R. & REGS. 1240-2-4-.01(1)(a). The Guidelines set forth a method for determining a parent's gross income. *Id.* at 1240-2-4-.04(3). Variable income, such as bonuses, commissions, and dividends, is to "be averaged over a reasonable period of time consistent with the circumstances of the case" and added to the parent's fixed salary. *Id.* at 1240-2-4-.04(3)(b). Regarding whether a certain period of time is "reasonable," one commentator notes, "There is no guidance as to the time frame over which the income should be averaged," adding "[i]f possible, figures should be considered for *at least* one year, particularly where the variations are seasonal in nature." JANET L. RICHARDS, RICHARDS ON TENNESSEE FAMILY LAW § 10-7(c) (2d ed. 2004) (emphasis added). Furthermore, Tennessee courts have displayed "a preference for long-term averaging as the most appropriate method for calculating income that is variable in nature." ***Anderson v. Anderson***, No. M2004-00078-COA-R3-CV, 2005 WL 2030614, *3 (Tenn. Ct. App. Aug. 23, 2005) (citations omitted) (remanding the case to the trial court for a redetermination of child support based on husband's average income over a long term period); ***see also, e.g., Alexander v. Alexander***, 34 S.W.3d 456, 460 (Tenn. Ct. App. 2000) (finding it appropriate to average the father's income over a period of four years to determine whether a significant variance existed for purposes of modifying child support); ***Stacey v. Stacey***, No. 02A01-9802-CV-00050, 1999 WL 1097975, *4 (Tenn. Ct. App. Oct. 6, 1999) ("Since the amount of the option income varies from year to year, it would be fair to average the option income in 1996 and 1997 and add this figure to Husband's base salary.").

As noted above, Husband's second amended Rule 14C affidavit, which the trial court accepted as "accurate and factual," lists his yearly bonuses for 2003, 2004, and 2005, which range from approximately $7,400 in 2003 to approximately $37,000 in 2005. It is undisputed that Husband's bonus at the end of trial in 2006 was the highest bonus he had received in the preceding four year period. Moreover, the trial court extrapolated Husband's 2006 income from his income in the first ten months of that year. Under all of these circumstances, we must conclude that the trial court failed to average Husband's variable income over a "reasonable period of time," and therefore

the trial court's finding on Husband's income for child support purposes must be reversed and the case remanded for recalculation of his income. *See* Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(b); *Anderson*, 2005 WL 2030614, at *3; *Alexander*, 34 S.W.3d at 460; *Stacey*, 1999 WL 1097975, at *4.

Husband argues as well that the trial court erred in considering Wife's income as zero in its calculation of his child support obligation. Based on our review of the record, the trial court's characterization of Wife's earnings as "meager" is accurate. The only jobs Wife could find were part-time jobs paying minimum wage or less, with schedules that interfered with Wife's parenting responsibilities. Considering Wife's language barriers, lack of education, lack of job skills, and parenting obligations, the trial court's decision to consider Wife's income as zero in its child support calculation was fully warranted. Husband's argument on this issue is wholly without merit. Therefore, on remand, when the trial court recalculates Husband's child support obligation, Wife's income should again be considered to be zero.

As a further issue on appeal, Husband argues that the trial court deviated upward from the Child Support Guidelines in ordering Husband to pay the first and second mortgages on the Heather Ridge residence until paid in full without stating (1) the reasons for the deviation, (2) the amount of child support that would have been required in the absence of a deviation, (3) a statement of why application of the Guidelines would be unjust or inappropriate, and (4) a statement of why the best interests of the children are served by the deviation. Indeed, in its oral ruling, the trial court stated that Husband would be ordered to make mortgage payments on the Heather Ridge home until it was paid in full, and the subsequent written order says this as well. In its oral ruling, the trial court stated that these payments would be considered an upward deviation in child support until the youngest child reaches age eighteen.[13] The written order on child support does not include this statement. The findings requested by Husband are required under the Child Support Guidelines. *See* Tenn. Comp. R. & Regs.1240-2-4-.01(e); *see also* T.C.A. § 36-5-101(e)(1)(A) (2005); *Neal v. Neal*, No. M2003-02703-COA-R3-CV, 2005 WL 1819214 (Tenn. Ct. App. Aug. 2, 2005). Our holding revising the award of child support requires remanding the case for a recalculation of the child support award. On remand, the trial court is directed to clarify whether the mortgage payments are child support and, if so, state the reasons and findings underlying any deviation from the Child Support Guidelines in its award of child support.

### Property Division

We next address the trial court's division of property. Husband argues that the trial court erred in ordering the parties to retain the marital home as tenants in common after the divorce. Husband contends that the home was his separate property, based on paragraph 3.09 of the prenuptial agreement, which provides:

---

[13] It is unclear whether the trial court intended for the mortgage payments to be considered child support *after* the parties' youngest child turns eighteen or, if so, whether such an award would be permissible.

The parties agree that all rents, issues, profits, increase, appreciation, and income from the separate property of [Husband], as set forth in Exhibit "A" shall remain his separate property. The parties agree that a change in the form of [Husband's] separate property shall not constitute a change of characterization, and the separate property shall remain [Husband's] separate property regardless of any change in form. For example . . . if [Husband] traded some of his real estate for other real estate, that new real estate would remain Husband's separate property.

Exhibit "A" to the agreement lists Husband's Burbank home. Husband testified that the proceeds from the sale of the Burbank residence were used to purchase the parties' Heather Ridge residence, and that consequently, the Heather Ridge home was his separate property. He concedes that the Heather Ridge home was titled jointly in both parties' names as tenants by the entireties. He maintains, however, that the Heather Ridge home was his separate property under paragraph 3.12 of the prenuptial agreement, which states, in essence, that the failure to segregate the parties' separate property does not change the separateness of that property.

The trial court found that this issue was governed by paragraph 3.15 of the prenuptial agreement, which states: "Nothing shall prevent the parties from jointly acquiring property or obligations. However, such community property or community obligations shall be clearly set forth as such, and shall contain, at a minimum, the names of both parties." Noting that the Heather Ridge residence was held by both parties as tenants by the entirety, the trial court ordered the parties to become tenants in common with respect to their ownership of the home.

Despite apparent problems with the prenuptial agreement, Wife did not challenge its validity or enforceability in the trial court below, and does not do so on appeal. Therefore, for purposes of appeal, we presume it is valid and enforceable. Consequently, the resolution of this issue concerns the interpretation of the parties' prenuptial agreement. This is an issue of law, reviewed *de novo* with no presumption of correctness. ***Bowden v. Ward***, 27 S.W.3d 913, 916 (Tenn. 2000); ***see also*** ***Gilley v. Gilley***, 778 S.W.2d 862, 863 (Tenn. Ct. App. 1989).

When the terms of a contract are plain and unambiguous, they should be interpreted as they are written. ***Petty v. Sloan***, 277 S.W.2d 355, 361 (Tenn. 1955). When the contract is ambiguous, however, we must gather the intention of the parties from the contract as a whole. ***Greyhound Lines, Inc. v. Sharpe***, 565 F. Supp. 419, 421 (E.D. Tenn. 1983) (citing ***Dearing v. Brush Creak Coal Co.***, 186 S.W.2d 329 (Tenn. 1945)). A contract is ambiguous only if "it is of uncertain meaning and may fairly be understood in more ways than one." ***Empress Health and Beauty Spa, Inc. v. Turner***, 503 S.W.2d 188, 190-91 (Tenn. 1973).

We find no error in the trial court's analysis of this issue. Neither paragraph 3.09 nor paragraph 3.12 appear applicable – even assuming that the trial court credited Husband's testimony that the proceeds from the Burbank home were put directly toward the purchase of the Heather Ridge home – because neither paragraph addresses jointly-titled property. Paragraph 3.15, however, directly addresses this issue, stating that nothing in the agreement prevented the parties from jointly

acquiring property. Regardless of the origin of the monies used to buy the marital home, it is undisputed that it was acquired by the parties as tenants by the entireties. Under these circumstances, we find that the trial court correctly held that the parties took ownership of the Heather Ridge residence pursuant to paragraph 3.15. It is well-established that, in Tennessee, by operation of law, divorce "converts a tenancy by the entirety into a tenancy in common." **Hicks v. Boshears**, 846 S.W.2d 812, 818 (Tenn. 1993). Based on the record on appeal, we cannot conclude that the trial court erred in ordering the parties to hold the property as tenants in common.

Husband argues on appeal that he should have been awarded the entire equity in the Heather Ridge property because the down payment came from the sale of the Burbank residence, which was his separate property. Husband does not point to any place in the record in which he raised this issue at trial; it appears that he relied almost exclusively on his argument that the Heather Ridge home was entirely his separate property. Regardless, given the parties' circumstances as a whole, we find no error in its decision not to award Husband the entire equity in the residence.

We note that, under the trial court's order, the parties will indefinitely remain tenants in common as to the Heather Ridge home, long after their children are grown and gone. In any divorce, the ultimate goal is to sever the ties between the parties and relieve them "of the impediments incident to the dissolved marriage." **Herrera v. Herrera**, 944 S.W.2d 379, 387 (Tenn. Ct. App. 1996) (quoting **Self v. Self**, 861 S.W.2d 360, 361 (Tenn. 1993)) . The trial court indicated that it was aware of the problems that loomed when one party or another wished to sell the residence, but failed to resolve it. On remand, the trial court is directed to establish a time frame for either sale and partition of the Heather Ridge home, or some other method for severing the parties' respective interests in the property. This should include establishing the parties' percentage interest in the property.

On appeal, Wife appears to raise an issue as to whether the trial court erred in finding that all of Husband's retirement accounts were his separate property, including the portion accumulated during the parties' marriage.[14] Wife, however, articulates no reasoning for this argument, and the issue appears governed by the parties' prenuptial agreement, as held by the trial court.

The parties do not appear to appeal the trial court's allocation of the marital debts, except insofar as Husband argues that the overall payments required of him exceed his ability to pay.[15] These include Wife's car payment of $280 per month, Wife's cosmetology school loan of $150 per month, and the parties' credit card debt of $150 per month. Therefore, we affirm the trial court's division of the parties' property and debts.

---

[14]The value of these retirement accounts at the time of trial was $298,823.

[15]Husband's objections as to the mortgage payments on the Heather Ridge residence are addressed above in our analysis on Husband's child support obligation.

**Spousal Support**

We next consider the trial court's award of alimony in futuro to Wife in the amount of $1,255 per month. On appeal, Husband argues vigorously that the trial court erred in its award, for an array of reasons. Husband argues that the trial court erred in (1) assuming that Wife would have no income, (2) finding that Wife could not be rehabilitated, (3) disregarding the provision in the prenuptial agreement allegedly limiting the duration of any spousal support, (4) finding that the alimony waiver provision in the prenuptial agreement was unenforceable, (5) awarding Wife alimony in futuro as opposed to rehabilitative alimony, (6) awarding Wife more alimony than her needs warrant, (7) erroneously calculating Husband's income and earning capacity, (8) ordering Husband to pay alimony that exceeds his ability to pay, and (9) ordering Husband to pay Wife's medical expenses and prescription drugs in the absence of any evidence of their costs. We address these issues in turn.

Tennessee Code Annotated § 36-5-121 provides guidelines for setting spousal support. Although courts are to consider these guidelines, "there are no hard and fast rules for determining whether a spouse should be required to support a former spouse." *Crain v. Crain*, 925 S.W.2d 232, 233 (Tenn. Ct. App. 1996). In Tennessee, it is clear that the two most important considerations in setting spousal support are the need of the supported spouse and the ability to pay of the supporting spouse. *Robertson v. Robertson*, 76 S.W.3d 337, 342 (Tenn. 2002); *Manis v. Manis*, 49 S.W.3d 295, 304 (Tenn. Ct. App. 2001). Furthermore, trial courts have broad discretion to set spousal support; such decisions are only overturned on appeal upon a finding that such discretion was abused. *Hanover v. Hanover*, 775 S.W.2d 612, 617 (Tenn. Ct. App. 1989) (citing *Ingram v. Ingram*, 721 S.W.2d 262 (Tenn. Ct. App. 1986)).

Husband argues that the trial court should not have assumed that Wife's income would be zero; rather, it should have taken into account Wife's part-time employment as a waitress at $3.50 per hour (plus tips) and her part-time job at Northwest Airlines at $6.35 per hour. At trial, however, Husband argued that Wife's employment at Northwest Airlines prevented her from discharging her parenting responsibilities under her proposed parenting plan. Wife acknowledged that her work hours required the children to spend the night at Husband's home on days when they were scheduled to be with Wife, and indicated her willingness to quit the Northwest Airlines job.

As noted in the context of our discussion of the child support award, the trial court's description of Wife's earnings in these jobs as "meager at best" is painfully accurate. In assessing the parties' credibility at the time of trial, the trial court credited Wife's testimony that she was willing to quit her Northwest Airlines job in order to properly discharge her parenting responsibilities. Based on the record before us, and according appropriate deference to the trial

-20-

court's credibility determinations, we find no error in the trial court's finding that Wife's income should be considered zero for purposes of determining spousal support.[16]

Husband also contends that there is no basis for the trial court's finding that Wife could not be rehabilitated, noting that she is able-bodied and was capable of holding down two part-time jobs. To the contrary, the evidence supporting the trial court's finding is plentiful. In an apparent effort at rehabilitation, Wife attended cosmetology classes; this attempt failed when Wife developed an allergy to the chemicals used and was unable to pass the licensing exam.[17] Likewise, Wife's employment at Dillard's foundered. The only employment Wife could find were part-time jobs paying minimum wage or less, which, as Husband conceded, interfered with Wife's parenting. As we noted in the discussion of child support above, Wife faces considerable challenges, including her lack of proficiency in English, her lack of education, her lack of job skills, and the demands of raising the parties' three children. Husband's argument is wholly without merit.

Next, Husband argues that the parties' prenuptial agreement limited the duration of any alimony awarded. He relies on paragraph 3.05, which states:

> [Husband] and [Wife] agree that in the event either party files for dissolution of marriage, the first two years of their marriage shall be excluded form [sic] any consideration in the awarding of spousal support, as though it [sic] did not exist. To the extent applicable, the parties waive the provisions of Family Code §4320(f) and §4320(k) which provides [sic] that a court of competent jurisdiction, in determining spousal support, shall take into account the duration of the marriage, and that a "reasonable period of time" for a party to become self-supporting shall generally be one-half the length of the marriage. The parties understand that as a consequence of this provision, should either party file for dissolution of marriage within two years of their marriage, neither party shall be entitled to apply for or receive spousal support from the other. For example, if the parties are married for 6 years, the Court shall, in determining both amount and duration of spousal support, deem the marriage to be of 4 years' duration.[18]

---

[16]We note that Husband sought to submit evidence of Wife's continued employment as a post-judgment fact to be considered on appeal. Because we found this to be inappropriate for submission as a post-judgment fact, Husband's motion was denied.

[17]The record was unclear as to whether Wife's failure to pass the licensing exam was because of her deficiency in English. While the trial court commented on this, it made no factual finding.

[18]Sections 4320(f) and 4320(k) are provisions of the California Family Code.

Husband contends that this provision limits the award of any spousal support to a duration of the length of the parties' marriage, minus two years.[19] We do not read this provision as so limiting the trial court's ability to award alimony. Certainly, the provision states clearly that the duration of the marriage for the purposes of awarding alimony should be calculated by excluding the first two years of the parties' marriage. It does not, however, preclude an award of alimony in futuro. If the parties intended a waiver of any right to alimony in futuro, that could have been stated expressly. It was not.

Here, the trial court's award of alimony in futuro was not based on the duration of the parties' marriage. Rather, it was based on the circumstances of the case: Wife and the parties' first child came to the United States from the Philippines at Husband's behest, and Wife now finds herself in the United States without a spouse, deficient in the English language, lacking in education and job skills, with no assets, and with three children to raise. An award of alimony in futuro is warranted when "the court finds that there is relative economic disadvantage and that rehabilitation is not feasible, meaning that the disadvantaged spouse is unable to achieve, with reasonable effort," a post-divorce standard of living comparable to the standard enjoyed during the marriage. T.C.A. § 36-5-121(f)(1) (2005). We find that the language of the prenuptial agreement does not proscribe an award of alimony in futuro, and the circumstances warrant such an award.

This holding makes it unnecessary for us to address the trial court's holding that any alimony waiver in the prenuptial agreement was unenforceable.

Husband also maintains that the trial court erred in finding that Wife's needs and his ability to pay warranted alimony in the amount of $1,255 per month. He contends that, considering that Husband was ordered to be responsible for the monthly mortgage payment for the Heather Ridge residence plus substantial child support, Wife has no need for alimony.

In order to evaluate Husband's ability to pay alimony in futuro, we look first at his income. *See Hazen v. Hazen*, No. W2003-00778-COA-R3-CV, 2004 WL 1334517, *3 (Tenn. Ct. App. June 14, 2004). In the trial court below, it was undisputed that Husband had a base net monthly salary of $4,829.[20] As of the date of the trial in October 2006, Husband had already earned $43,402 in bonuses. Despite Husband's unrefuted testimony that his bonuses were variable, testimony that was not discredited by the trial court, the court apparently assumed that Husband would continue to be paid bonuses in the same amount. Noting that Husband had earned an average of approximately

---

[19] In his appellate brief, Husband asserts that, at one point, the parties stipulated that Wife would receive only thirty-six months of alimony. He argues that Wife should be bound by this stipulation, while at the same time acknowledging that he withdrew his agreement to the stipulation prior to the conclusion of the trial. Apparently, during a several-month interlude in the proceedings, the Child Support Guidelines changed in a manner that resulted in an increase in Husband's child support obligation. In light of this, Husband withdrew his stipulation and took the position that he should not be required to pay any alimony. Under these circumstances, Husband's argument that Wife should nevertheless be bound by the alleged stipulation is without merit.

[20] This figure comes from Husband's second amended Rule 14C affidavit, which the trial court found to be "accurate and factual."

$10,649 per month, including bonuses, up to the date of trial in October 2006, the trial court extrapolated from that figure that Husband would earn $137,112 by year's end.[21]

Here, the trial court made findings of fact and conclusions of law regarding Husband's ability to pay based on trial testimony and exhibits. Specifically, the trial court found that Husband earned approximately $10,649 per month in 2006 and projected that he would earn a gross income of $137,112 by the year's end. This was determined to be his income for purposes of setting spousal support. Calculating Husband's yearly income based on income earned during only 9.5 months, when Husband's bonuses were variable and income figures for several years were available, is troubling for the reasons set forth in our discussion of Husband's child support obligation, above. Also troubling is the total picture of how much Husband has been ordered to pay out of this amount of income. Not including spousal support, Husband was ordered to pay child support in the amount of $1,769 per month, the mortgage debt on the parties' martial home in the amount of $1,411 per month, the home equity line of credit in the amount of $200 per month, Wife's car payment in the amount of $280 per month, Wife's cosmetology school loan in the amount of $150 per month, and the parties' credit card debt in the amount of $150 per month. These obligations add up to a monthly payment of $3,960. In addition, Husband was ordered to pay Wife's medical insurance, and half of all documented medical expenses not covered by this insurance. No dollar amount was attached to this obligation.

To determine the appropriate amount of spousal support, the trial court looked at Wife's financial needs. The trial court found Wife's Rule 14C affidavit to be "most reflective of [Wife's] needs." The trial court's list of Wife's monthly expenses included $375 for utilities, $50 for miscellaneous household needs, $100 for telephone service, $400 for food, $150 for clothing, $100 for Christmas gifts, $100 for personal entertainment, and $80 for cable/internet service.[22]

The record certainly supports the trial court's finding that Wife had accurately listed her expenses in her Rule 14C affidavit, and that the expenses listed were "basic needs" and far from extravagant. However, the trial court simply totaled these figures at $1,255 per month and awarded spousal support in that amount. Adding this amount of spousal support to the child support and other expenses listed above results in a total monthly obligation for Husband of $5,215 per month

---

[21] The trial court's calculation of Husband's 2006 salary appears to be based on a 13-month year. The October 15, 2006 pay stub lists Husband's gross pay to date as $111,812.80. From this, the trial court found that Husband had earned $10,649 per month in 2006 ($111,812.80 ÷ 10.5 = $10,649). As October 15 is actually 9.5 months into the year, and not 10.5 months, this initial calculation appears to be erroneous. The court went on to state that there were another 2.5 months in the year and used the $10,649 figure to find that Husband would earn another $26,622 in 2006 ($10,649 * 2.5= $26,622). From this, the trial court found an annual salary for 2006 in the amount of $137,112 (but $111,812.80 + $26,622 = $138,434.8). Because dividing Husband's year-to-date earnings by 9.5 would result in a larger monthly salary than dividing them by 10.5, the court's calculations resulted in a lower yearly salary. Wife did not raise this issue in her brief.

[22] These figures add up to monthly expenses in the amount of $1,355, not $1,255 as the trial court found. However, on appeal, Wife does not take issue with the trial court's calculations.

-23-

plus Wife's medical insurance and half of her uncovered medical expenses. This is before payment of Husband's living expenses, listed in his Rule 14C affidavit at approximately $1,800 per month.

The problem appears to stem from (a) the manner in which the expenses of Wife and the parties' children were presented to the trial court, (b) the trial court's decision to set spousal support prior to its calculation of child support, and (c) a failure to look at the overall picture of the needs of Wife and the children versus Husband's income.

First, Wife's Rule 14C affidavit appears to list not only her expenses but also those of the parties' three children.[23] Some of the children's expenses are set out separately, such as school lunches and day care. For others, of course, Wife's needs and those of the children overlap, as with utility payments, transportation expenses, and the like. Still others are expenses for Wife alone.

Presenting expenses in this manner creates difficulties when the trial court sets spousal support before setting the child support obligation, as was done in this case. With the expenses of Wife and the children presented jointly, and without knowing the amount of child support, there is no way to know how much of the overall expenses will be covered by child support.

Second, the trial court set spousal support, for which purpose it considered Wife's need and Husband's ability to pay, before setting child support. There is a dearth of legislative guidance regarding the order in which a trial court should address the various issues presented in the dissolution of a marriage. However, this Court addressed the order in which such issues should be analyzed in *Anderton v. Anderton*, 988 S.W.2d 675, 679-80 (Tenn. Ct. App. 1998). In *Anderton*, we stated:

> The dissolution of a marriage requires the courts to engage in the orderly disentanglement of the parties' personal and financial affairs. Many of the issues that must be addressed during this process are interrelated, and the disposition of earlier issues directly influence the decision on later issues. Accordingly, the parties and the courts should pay careful attention to the order in which the various issues in a divorce case are addressed and decided.
>
> * * *
>
> The trial court's first task . . . is to identify and distribute the parties' separate property and then divide their marital property in an equitable manner. . . . Sorting out the parties' property interests must precede support decisions because the manner in which the separate and marital property is divided can affect later support decisions.

---

[23]The record does not indicate whether Wife's Rule 14C affidavit included *all* of the children's expenses. This impacts, for example, the trial court's evaluation of the portion of the overall expenses that would be covered by Husband's child support payments.

After the parties' property interests have been addressed, trial courts should then turn their attention to child support. . . . Child support decisions should precede decisions about spousal support because a spouse's ability to pay spousal support may be directly and significantly influenced by the amount of child support he or she has been ordered to pay.

Consideration of spousal support questions should follow the disposition of all the preceding questions.

*Anderton*, 988 S.W.2d at 679 (citations and footnotes omitted). In the case at bar, the trial court's failure to set child support prior to setting the award of spousal support clearly impacted its determination of Wife's needs (apart from the children's needs) and Husband's ability to pay.

Third, we look at the overall amount Husband was ordered to pay, juxtaposed against the expenses claimed by the Wife. In her 14C affidavit, Wife claimed total monthly expenses of $4,602, including the mortgage payment for the Heather Ridge residence. Including the mortgage payment, child support, and spousal support, Husband was ordered to pay $5,215 per month plus insurance and medical expenses. This exceeds Wife's claimed needs.[24]

The trial court, of course, has broad discretion in determining whether an award of alimony is appropriate, and the proper amount and duration of the award. *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995); *Hanover v. Hanover*, 775 S.W.2d 612, 617 (Tenn. Ct. App. 1989). Moreover, Husband in this case has substantial earning capacity, and Wife has little or no ability to pay for her own needs or to contribute toward the financial needs of the parties' children. Nevertheless, considering the record as a whole, we must conclude that the amount of alimony awarded was an abuse of discretion.

We are unable to modify the alimony award because, as set forth above, we must remand the case to the trial court for recalculation of Husband's income and his child support obligation. Without this information, we cannot determine either Wife's needs or Husband's ability to pay. Therefore, we must vacate the alimony award and remand that issue to the trial court as well.

On remand, the trial court may, of course, consider Husband's separate property in determining his ability to pay. T.C.A. § 36-5-121(i)(7) (2005). Considering the legitimate needs of Wife and the children, it is not necessarily inappropriate to ask Husband to encroach upon his separate monies to ensure that their basic needs, and his, are met. Moreover, considering the fact that Wife has little or no ability to earn money, the trial court may, in its discretion, increase Wife's alimony as Husband's child support obligation decreases and ultimately ends. The trial court may,

---

[24]This is based on the assumption that Wife's Rule 14C affidavit includes all of the children's needs. Moreover, the trial court did not indicate whether it found that Wife had needs over and above those claimed in her Rule 14C affidavit, such as a need to provide for her retirement, the purchase of a replacement vehicle, or other long-term needs. This would impact her need for spousal support.

in its discretion, hear additional proof on items such as the anticipated cost of Wife's medical insurance and uncovered medical expenses.

## Attorney's Fees

The trial court ordered Husband to pay Wife's attorney's fees and expenses in the amount of $22,180.30. Husband challenges the award of fees and expenses, arguing that the evidence preponderates against the award. Wife responds that Husband has the ability to pay for her fees and that she has no assets with which to pay them.[25]

In a divorce proceeding, an award of attorney's fees is an issue within the trial court's discretion; that decision will only be overturned upon a finding of abuse of discretion. ***Smith v. Smith***, 984 S.W.2d 606, 610 (Tenn. Ct. App. 1997) (citing ***Storey v. Storey***, 835 S.W.2d 593, 597 (Tenn. Ct. App. 1992)). Generally, an award of attorney's fees is appropriate if the spouse receiving the award would be unable to pay such fees. ***Id.*** (citing ***Brown v. Brown***, 913 S.W.2d 163, 170 (Tenn. Ct. App. 1994)).

It is evident from the record that Wife has no assets with which to pay her attorney's fees, and that Husband, based on his earning capacity and separate assets, has the ability to satisfy the award. Under these circumstances, we find no abuse of discretion in the trial court's decision to award Wife her attorney's fees and expenses.

Wife also argues that Husband should be ordered to pay her attorney's fees for this appeal. Considering the result reached in this appeal, we decline to make such an award.

## CONCLUSION

In sum, we vacate the award of child support and the award of spousal support, and remand the cause for recalculation of Husband's income, Husband's child support obligation, and reconsideration of the award of spousal support. Also, we vacate the parenting plan insofar as it awards the federal income tax exemptions for the children to Wife, and remand for the trial court to award the exemptions to Husband. The trial court's decision is affirmed on all remaining issues. Wife's request for attorney's fees on appeal is denied.

---

[25]The record indicates that Wife sold her only assets listed in the prenuptial agreement, jewelry, in order to pay the retainer for her attorney.

The decision of the trial court is affirmed in part and vacated in part as set forth above, and remanded for further proceeding not inconsistent with this Opinion. Costs of this appeal are taxed equally to Appellant David Mark Burnett, and his surety, and Appellee Analiza P. Burnett, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE